## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

PETER WEBER,

                Plaintiff,

v.

DON LONGO, INC., DONALD P.
LONGO, WILLIAM LONGO, JOHN
DOE 1-5, MARY DOE 1-5, and/or
DOE CORPORATION 1-5

                Defendants.

Civ. No. 15-2406 (KM)(MAH)

**OPINION**

### KEVIN MCNULTY, U.S.D.J.:

The plaintiff, Peter Weber, brings this action against defendants Don Longo, Inc. (the "Company"), Donald P. Longo ("Donald"), William Longo ("William") (collectively, "Longo") for disability discrimination, in violation of the Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101 *et seq.*; the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5–1, *et seq.*; fraud; equitable fraud; and intentional infliction of emotional distress.

Now before the Court is defendant Longo's motion for summary judgment. For the reasons discussed below, Longo's motion is granted.

# TABLE OF CONTENTS

I.    Background.................................................................................3
      A. Procedural History.....................................................................3
      B. Relevant Facts..........................................................................4
      C. Disputed Facts.........................................................................11

II.   Legal Standard...........................................................................14

III.  Discussion.................................................................................16

      A. Counts I and II- ADA and NJLAD Claims- Discriminatory
         Discharge.............................................................................16
                1. ADA.........................................................................17
                      i.    Disability.........................................................18
                            a. "Actual disability" prong.............................19
                            b. "Regarded as disabled" prong.......................24

                2. NJLAD........................................................................26

      B. Counts III and IV- Fraud and Equitable Fraud.............................29

      C. Count V- Intentional Infliction of Emotional Distress....................32

IV.   Conclusion................................................................................34

## I.   Background[1]

### A. Procedural History

On April 6, 2015, Weber brought suit in this Court against Don Longo, Inc., Donald P. Longo, William Longo, John Doe 1-5, Mary Doe 1-5, and/or Doe Corporation 1-5. (Compl.) The Complaint asserts five counts. Count I alleges a violation of the ADA, Count II alleges a violation of the NJLAD, Count III alleges fraud, Count IV alleges equitable fraud, and Count V alleges intentional infliction of emotional distress.

On April 30, 2015, Longo filed an Answer. (ECF no. 3). On June 30, 2017, Longo filed a motion for summary judgment. (ECF no. 37).  On July 31, 2017, Weber filed a memorandum in opposition to Longo's motion for summary judgment. (ECF no. 38). On August 7, 2017, Longo filed a reply brief. (ECF no. 39).[2]

---

[1]      Record items cited repeatedly will be abbreviated as follows:

"Compl." = Complaint (ECF no. 1)

"Def. Br." =   Brief in Support of Defendant Longo's Motion for Summary Judgment (ECF no. 37)

"Pl. Opp." =   Plaintiff Weber's Opposition to Defendant Longo's Motion for Summary Judgment (ECF no. 38)

"Def. Reply" = Reply Brief in Further Support of Defendant Longo's Motion for Summary Judgment (ECF no. 39)

[2]      On January 30, 2017, Longo filed a motion to exclude expert testimony and report. (ECF no. 25-4). On March 6, 2017, Weber filed a memorandum in opposition to Longo's motion. (ECF no. 31). On March 13, 2017, Longo filed a reply brief. (ECF no. 32). The motion has not been decided.

### B. Relevant Facts[3]

On July 7, 2014, Weber began employment as a machine operator/
laborer at Don Longo, Inc., referred to herein as the "Company,"[4] a family-run
business located in Chester, New Jersey. (DSMF ¶¶ 2, 5) (citing ECF no. 37-1,
Exh. B at 7:22 to :23; Compl. ¶¶ 6, 13). Donald Longo is the president of the
Company and is semi-retired. (*Id.* at ¶ 3)(citing ECF no. 37-1, Exh. C at 5:14 to
:19). William Longo, Donald Longo's son, does not have a formal title at the
Company but works in a role similar to that of project manager and assumes
Donald's role when Donald is inactive.[5] (*Id.* at ¶ 4)(citing ECF no. 37-1, Exh. B
at 7:20 to :23). William runs the Company with the help of his sisters, Donna
Reynolds and Jeralyn Weiss. (*Id.*)

The Company has a policy of providing new employees with a
performance review about two months after their date of hire.[6] (*Id.* at ¶ 7)(citing
ECF no. 37-1, Exh. B at 105:21 to 106:7). Based on the review, a decision is
made as to whether the employee's service will be continued. (*Id.*) As per the
policy, the Company's review of Weber would have been held on or about
September 7, 2014. (*Id.*)

During Weber's employment at the Company, William recalled speaking
to Weber about his work performance. (*Id.* at ¶ 8)(citing ECF no. 37-1, Exh. B
at 106:11 to :16). In particular, William testified that "[t]here were comments

---

[3]    For purposes of this motion, I consider Defendant Longo's Statement of
Undisputed Material Facts ("DSMF")(ECF no. 37-2), Plaintiff Weber's Statement of
Undisputed Material Facts ("PSMF")(ECF no. 38-1), and Defendant Longo's Response
to Plaintiff Weber's Statement of Undisputed Material Facts ("DRSMF")(ECF no. 39-2)
pursuant to Local Rule 56.1, as well as the deposition testimony and documentary
evidence.

[4]    Don Longo, Inc. was formed and incorporated under New Jersey State law.
(DSMF ¶ 2)(citing ECF no. 37-1, Exh. B at 7:22 to :23).

[5]    During their depositions, Donald Longo and Donald Weber referred to William
Longo as "Billy." *See* ECF no. 37-1, Exhs. C and D. To avoid confusion, I will refer to
Donald Longo as Donald and William Longo as William.

[6]    There is dispute as to whether the policy is explained to all employees on their
date of hire. (DSMF ¶ 7; PSMF ¶ 7). Weber testified that no one explained to him that
he would be a probationary employee. (ECF no. 38-3, Exh. A at 52:8 to :11).

4

made as needed as observed. If there was a procedure, fittings being assembled that there may have been a more efficient way or something easier to do. . . [he] remember[ed] speaking with [Weber] a few different times. Not in a threatening manner, just instruction manner." (ECF no. 37-1, Exh. B at 106:11 to :16).

On August 19, 2014, Weber installed various plumbing lines and fittings for a project at an automobile service facility. (DSMF ¶ 15)(citing ECF no. 37-1, Exh. D at 61:24 to 62:4). He acknowledged that the lines and fittings had issues, including leaks and fittings that were not properly tightened. (ECF no. 37-1, Exh. D at 61:24 to 62:4).

The next day, August 20, 2014, William instructed Weber to create a combination of a splash guard and a drip pan, designed to "contain any spills or splashing" during the filling of oil tanks. (DSMF ¶ 16)(citing ECF no. 37-1, Exh. B at 54:17 to :24). That morning, William and Weber drove to the work site, where they spent three hours "taking physical measurements of the equipment and discussing multiple options for construction of the backsplash/drip tray." (*Id.*)(citing ECF no. 37-1, Exh. B at 55:7 to :17). They discussed that "steel would have to be cut" and "would have to be possibly sent out to be bent and/or [they] would weld it in house." (ECF no. 37-1, Exh. B at 59:8 to :10). However, they did not discuss the specific tools that Weber had to use. (ECF no. 37-1, Exh. B at 59:7). Afterward, they visited another site owned by the same customer so that William could show Weber a similar product that the Company had fabricated years earlier. (*Id.*)

According to William, they then drove back to the Company shop, where William gathered some material for Weber to work with. (ECF no. 37-1, Exh. B at 55:18 to :20). William testified that he and Weber discussed that if that steel was not the proper size or shape, Weber had the approval to contact a supply house and purchase the proper steel. (*Id.* at 59:11 to :14). William also provided Weber with the phone number and the contact name of the supply house. (*Id.* at 55:21 to :22).

William returned to his office while Weber gathered his materials. (*Id.* at 56:4 to :6). Soon thereafter, William returned to the on-site work area because he heard the sound of a grinder being used which he thought was "quite odd" given the material that Weber was working with. (*Id.* at 56:11 to :14). Arriving at Weber's work space, he saw Weber using a grinder. (*Id.* at 56:11 to :12). William asked Weber to stop using the grinder, and also asked where he had gotten it. (*Id.*) At his deposition, William explained that he asked Weber to stop using the grinder because it was a broken grinder that had no guard on it and was not the right tool for the assignment. (*Id.* at 56:15 to :25). At that point, William provided Weber with blades for a reciprocal saw, though he did not give Weber the reciprocal saw itself. (*Id.* at 57:3 to :7). William testified that reciprocal saws could be found in other trucks, or throughout the shop. (*Id.*)

William then left the shop, believing that he had "left [Weber] to keep working with the saw and not the grinder." (*Id.* at 57:3 to :8). However, later that day, upon returning from his off-site duties, William was informed that Weber had lacerated his left index finger on the grinder. (*Id.* at 57:12 to :15). According to Weber, he lacerated his finger because the wheel on the grinder exploded. (DSMF ¶ 19)(citing ECF no. 37-1, Exh. D at 71:9 to :14). Donald took Weber to a medical clinic where Weber received stitches.[7] (*Id.* at ¶ 20)(citing ECF no. 37-1, Exh. C at 21:2 to :5). After the visit to the clinic, Donald told Weber to rest his hand and take two days off with pay because he did not want Weber to reinjure his finger. (ECF no. 37-1, Exh. C at 23:4 to :7, 25:8 to :9).

Notwithstanding Donald's instruction, Weber returned to work the next day, August 21, 2014. (DSMF ¶ 21). Donald testified that because Weber "insisted on working," he placed Weber on "light duty." (ECF no. 37-1, Exh. C at 23:12 to :18). Although Weber was on "light duty," he continued to work on the same project that he was working on when he was injured- i.e., the creation of a combination of a splash guard and a drip pan. (DSMF ¶ 22)(citing ECF no. 37-1, Exh. C at 28:8 to :20). Donald testified that Weber "insisted on

---

[7]     The number of stitches is not stated by either party.

going back to the same thing," and was "adamant about going back and finishing or attempting to finish." (ECF no. 37-1, Exh. C at 28:8 to :11).

At some point during Weber's employment,[8] William instructed Weber to 1) install six pumps onto brackets which were already on the wall, and 2) do the preliminary piping. (DSMF at ¶ 9) (citing ECF no. 37-1, Exh. B at 41:14 to 42:21). Later that day, after Weber had begun installing two pumps, Weber informed William that he did not have enough fittings. (*Id.*) According to William, he "reminded [Weber] from [their] previous conversation of earlier that morning that the standard plumbing fittings that he needed were available within a mile of the job, north and south of the job." (ECF no. 37-1, Exh. B at 42:4 to :8). William testified that Weber responded that he "would take care of picking up whatever fixings he needed." (*Id.* at 42:10 to :11). However, "[t]he fittings did not arrive by [Weber]'s doing, so [William] picked up the fittings," and returned to the work site. (*Id.* at 42:13 to :15).

According to William, Weber finished two more pumps the next day, and the last two pumps were completed on the third day in two hours. (*Id.* at 42:18 to :19, 45:23 to :24). Although William did not know if Weber was asked to do other tasks, he maintained that Weber's assignment "should have been one day's worth of work" rather than three. (*Id.* at 42:20 to :23).

On August 25 or 29, 2014, Donald asked Weber to build a drip pan. (ECF no. 37-1, Exh. D at 81:4 to :12). Weber testified that he "built [the drip pan] as to spec, as to what he wanted." (*Id.* at 81:9 to :10). However, Weber admitted that he made an "alteration" to the drip pan by "add[ing] one support in one corner." (*Id.* at 81:10 to :12). Donald testified that: "[Weber] decided to do something differently than what [Donald] instructed, to put the drip pan in place. And what [Weber] did created a bigger problem. . . [i]t deflected the metal, distorted it[.]" (ECF no. 37-1, Exh. C at 17:15 to :20). Don approached

---

[8]     It is unclear whether the date of the pump installation was July 22, 2014, before Weber's injury, or August 22, 2014, after Weber's injury. William's deposition testimony describes the date as August 22, 2014. *See* (ECF no. 37-1, Exh. B at 41:10 to 43:1). However, Weber's deposition testimony describes the date as July 22, 2014. *See* (ECF no. 37-1, Exh. D at 58:23 to 59:24).

Weber and told him that the pan was not going to work, and according to Don, "it certainly did not." (*Id.* at 17:18 to :19).

On August 27, 2014, according to William, Weber was instructed to go "near the back opening, the door way. . . to install or hook up two exhaust fans, mix the two porta-poxy paint, and apply it to the [drip pan]." (ECF no. 37-1, Exh. B at 50:12 to :16). Specifically, Weber "was supposed to paint, leave the fans going, [and] leave the [drip pan] outside. . . under the roof of the barn in the opening and leave the fans blowing outward." (DSMF ¶ 25)(citing ECF no. 37-1, Exh. B at 51:3 to :6). William testified that when he "arrived back at the shop later on that day, the apparatus was sitting in the center of the shop, the rear door was closed and the shop had inadvertently filled up with fumes from the paint outgassing." (ECF no. 37-1, Exh. B at 51:6 to :12).

In early September, Weber was asked to deliver some lifts to a project site. (DSMF ¶ 28). Weber recalled that William asked him why it took him so long to arrive at the site. (ECF no. 37-1, Exh. D at 78-12).

On September 5, 2014, Weber had his stitches removed at the medical clinic and then returned to work. (DSMF ¶ 30). Later that afternoon, William spoke to Weber and terminated his employment. (*Id.* at ¶ 31). William informed Weber that he was terminated for three reasons: 1) he took excessive time to accomplish his tasks, 2) he disregarded direct instructions, and 3) his co-workers had some level of discomfort working with him. (*Id.* at ¶ 32)(citing ECF no. 37-1, Exh. B at 109:13 to :19). After being terminated, Weber "exhibited agitated behavior" and "was overheard talking to himself saying he might as well shoot himself, his life was over, his wife was going to divorce him and they were going to lose their house." (*Id.* at ¶ 31)(citing ECF no. 37-1, Exh. C at 34:1 to :13). He also took a claw hammer and destroyed his hard hat while in the presence of other employees. (*Id.* at ¶ 33)(citing ECF no. 37-1, Exh. D at 83:1 to :9). At some point after being fired, Weber called William and asked him why he was fired. (ECF no. 38-3, Exh. A at 84:3 to :24).

Four days after the firing, on September 9, 2014, Weber and his wife, Deborah, arrived at the office of the Company (ECF no. 37-1, Exh. D at 83:10 to :17). Donald testified that he was working in the yard when Weber and his wife arrived. (ECF no. 37-1 at 36:13 to :16). He recalled that they wanted to know why Weber was terminated. (*Id.* at 36:20 to :21). Donald contacted William and once William arrived, a meeting was held with William, Donald, Weber, and Weber's wife. (Id. at 36:21 to 37:15).

As a result of the meeting, William and Donald agreed to have Weber return on a trial basis. (DSMF ¶ 34)(citing ECF no. 37-1, Exh. B at 118:2 to 119:3). William explained that he and his father "were torn between the fact that [he] did not want [Weber] back in [their] employment, but [he] didn't want to ruin somebody's life at the same time." (ECF no. 37-1, Exh. B at 118:4 to :7). He testified that he informed Weber that he would be working a minimum of two weeks and maximum of a month under William or Donald's direct supervision before a decision would be made as to whether he could stay on as an employee. (ECF no. 37-1, Exh. B at 118:9 to 119:3).

After the meeting was over and the Webers had left, William's sisters explained to William that they were concerned about working with Weber. (*Id.* at 119:10 to :18). Moreover, according to William, once some of the other employees learned that Weber would be returning to work, they either asked for a pay raise to work with Weber or threatened to quit if Weber was rehired. (*Id.* at 119:18 to :21). Don also testified that he asked employees to complete an anonymous survey[9] as to whether they were willing to work with Weber. (ECF

9    Longo submitted a copy of the survey responses as Exhibit E. *See* (ECF no. 37-1, Exh. E). Weber disputes the authenticity of the Exhibit. (PSMF ¶ 36).

In deciding a motion for summary judgment, the Court may consider only evidence which is admissible at trial. Fed. R. Civ. P. 56(e); *Countryside Oil Co., Inc. v. Travelers Ins. Co.*, 928 F. Supp. 474, 482 (D.N.J. 1995). Federal Rule of Evidence 901(a) states: "to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). However, the evidence need not technically be "in a form that would be admissible at trial in order to avoid summary judgment," so long as the evidence conforms to "the kinds of evidentiary materials listed in Rule 56(c)." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

no. 38-4, Exh. B at 43:15 to :20). He stated that he did not have any favorable responses. (*Id.* at 44: 5). William then decided not to re-hire Weber and contacted an attorney for advice. (*Id.* at 120:7 to :8).

According to Weber, he spoke to William about three times during the week following the meeting on the subject of his return date. (ECF no. 38-3, Exh. A at 93:20 to 94:21). He recalled that William put him off with excuses, including a statement that one of the job assignments had been postponed. (*Id.* at 94:18 to :21).

Weber subsequently received a letter, dated September 10, 2014, from Anthony J. Sposaro, Esq., an attorney representing the Company (ECF no. 37-1, Exh. F). The letter states that Weber's employment with the Company was terminated effective immediately. (*Id.*) It also expresses concerns about Weber's post-firing conduct:

> Under normal circumstances Don Longo, Inc. would have communicated directly with you. The circumstances, however, are far from normal. The conduct that you exhibited at my client's facility last Friday, together with text messages you sent to [William] Longo, have caused genuine concern. Smashing and destroying a construction helmet is not 'normal' behavior. Taken together your actions and communications are not only disturbing but threatening.

(*Id.*)

Enclosed with the letter was a severance check for $1,319.97, which represented two weeks' pay. (DSMF ¶ 38)(citing *id.*) William testified that he paid Weber for two weeks because that corresponded to the the minimum amount of time that he had promised to reemploy Weber on a trial basis. (ECF no. 37-1, Exh. B at 134:1 to :12).

Also on September 10, 2015, Donna contacted the Chester Township Police Department and filed an Incident Report related to events that took place on September 5 and 9, 2014. (ECF no. 37-1, Exh. G). On September 12, 2014,

---

Here, the anonymous surveys are attached to the Certification of John J. Lavin, Esq., who states that "[t]rue and correct copies" of documents are attached. The admissibility of the surveys is not dispositive of the current legal issues before this Court.

the Chester Township Police Department filed an Investigation Report based on a harassment complaint by Donald and Donna. (ECF no. 37-1, Exh. H).[10]

Six days later, on September 18, 2014, Attorney Sposaro sent Weber's wife a letter in response to an e-mail she had sent him on September 16, 2014. (ECF no. 37-1, Exh. I). Sposaro's letter states, in part: "Your husband's termination had nothing to do whatsoever with any job related injury." *Id.* It adds the following about the hard hat incident:

> Without belaboring the point, your husband's conduct was indeed threatening and disturbing. The smashing of the hard hat was a perfect example. The issue here is not who owned the hard hat, but rather the act of smashing it. Emotional outburst such as these are telling and troubling.

(*Id.*)

### C. Disputed Facts

Although many details are in dispute between Weber and Longo, the disputes that are essential can be distilled to a few core issues. Whether these are genuine, material issues that stand in the way of summary judgment will be discussed *infra*.

#### 1. Pre-September 5, 2014 Termination

##### i.  August 29, 2014 Meeting

The parties dispute whether William advised Weber that he was being fired on August 29, 2014.

According to William, he had a conversation with Weber about how he was considering letting him go. (ECF no. 37-1, Exh. B at 104:9 to :11). William testified that he came to his decision at the end of the week,[11] after numerous incidents, including Weber filling the shop with paint fumes and disobeying instructions, including his decision to use the grinder after being instructed

---

[10]    Weber disputes the authenticity of Exhibit G, the Incident Report, and Exhibit H, the Investigation Report. (PSMF ¶¶ 39, 40). Both Exhibits are police reports which are attached to the Certification of John J. Lavin, Esq., who states that "[t]rue and correct copies" of documents are attached. The admissibility of those Exhibits is not dispositive of the current legal issues before this Court.

[11]    August 29, 2014 was a Friday.

not to use it. (*Id.* at 104:18 to :25). William says he told Weber he was letting him go, at which point Weber asked him to reconsider and stated that he would do a better job if given more instruction. (*Id.* at 105:1 to :7). William says called Weber the next day, Saturday, and did not carry through with the dismissal. (*Id.* at 106:20 to 107:4). Weber returned to work on the following Monday. (*Id.* at 106:24 to :25).

Weber recalled having a meeting with William that day, but testified that William did not then advise him that he was going to fire him. (ECF no. 38-3, Exh. A at 77:4 to :16, 78:20 to :23). According to Weber, William expressed concern about his performance and they talked about it, after which Weber told him that they should be communicating more. (*Id.* at 77:12 to :14). He testified: "All I remember was a meeting about me getting involved more with the day-to-day operations and [William] saying that was a good idea." (*Id.* at 78:20 to :23).

### ii.    Weber's Job Performance

According to Weber, no concerns, other than taking too long on the pump installation, were ever raised to him about his performance or about his relationship with co-workers. (ECF no. 37-1, Exh. D at 64:7 to 65:15, 78:24 to 79:3); (PSMF ¶ 15). William stated that he had spoken to Weber about his work performance a few different times. (ECF no. 37-1, Exh. B at 106:11 to :16). In particular, he stated that "[t]here were comments made as needed as observed . . . [n]ot in a threatening manner, just instruction manner." (*Id.* at 106:11 to :12, :15 to :16). Moreover, Donald said that there was friction between Weber and the other employees. (ECF no. 38-4, Exh. B at 18:23 to 19:5).

Regarding the pump assignment, Weber testified that he had difficulty completing the task, but said it was because he did not have enough materials. (*Id.* at 58:23 to 59:4). He stated that William said he would bring the materials, but he never got them. (*Id.* at 59:4 to :8). He also testified that he was never given a time frame. (*Id.* at 59:17 to :18). According to Weber, William later recognized at the September 9, 2014 meeting that there were problems getting

materials. (*Id.* at 60:22 to 61:1). Similarly, according to Weber's wife, William acknowledged at the meeting that material was stolen from the supply house and that was the only reason the job took longer than it should have. (ECF no. 38-7, Exh. E at 11:1 to :7).

William recalled that Weber mentioned that he did not have enough fittings. (ECF no. 37-1, Exh. B at 42:1 to :4). However, according to William, he reminded Weber that the fittings he needed were available within a mile of the job. (*Id.* at 42:4 to :8). William says that Weber responded that he would go pick up the fittings himself. (*Id.* at 42:10 to :11).

As for the August 19 plumbing fittings, Weber recognized that they were not properly tightened. (*Id.* at 61:24 to 62:4). However, he testified that it was a result of faulty fittings which had been recalled. (*Id.* at 61:4 to :8). Weber stated that William had informed him that there was a recall on the fittings. (*Id.* at 62:9 to :16).

As for the painting of the drip pan on August 27, 2014, Weber claimed that he did follow William's instructions. (*Id.* at 63:4 to :13). He testified that the office became overcome with fumes because of the paint that William gave him to use. (*Id.* at 63:22 to 64:1). Weber said: "[n]o matter where that piece was, it was emanating fumes continuously." (*Id.* at 64:1 to 64:6). According to William, the paint was not the issue. Rather, the issue was that Weber did not follow his instructions to place the pan in a ventilated area; that was the reason, he says, that the shop to fill up with fumes from the paint outgassing. (ECF no. 37-1, Exh. B at 50:12 to 51:12).

### iii. Finger injury

Weber recognizes that on the date of his finger injury, William told him that he did not want him to cut the steel on the grinder. (ECF no. 37-1, Exh. D at 68:14 to :16). However, he maintains that William "never said *not to use* the grinder," (*Id.* at 70:11 to :12)(emphasis added), and that when he got injured, he was only using the grinder to scribe a line, not cut the steel. (*Id.* at 68:14 to

69:19). Weber testified that he was "scribing a line on a straight edge so [he] could cut it accurately with the Sawzall." (*Id.* at 69:1 to :3).

### 2. Post-Termination

#### i.    September 9, 2014 meeting

The parties dispute what William said to Weber and his wife about Weber's injury during the September 9, 2014 meeting. According to Weber and his wife, Weber told William that he did not take any time off when he hurt his hand, to which William responded by pointing to him and saying he was not happy about it. (ECF no. 38-7, Exh. E at 16:22 to 17:2); (PSMF ¶ 10). Longo denies this. (DRSMF ¶ 10).

#### ii.    Text Messages and Phone calls

According to Weber, William texted him on the night of September 9, 2014 and the following day.[12] (PSMF ¶ 13). He claimed that on September 9, 2014, William told him that the schedule was a mess and to return to work on Thursday. (*Id.*) He also claimed that William texted him again the next night. (*Id.*) According to Weber, William called him on that Friday and told him to start on Monday. (*Id.*) William, however, denies this. (DRSMF ¶ 13).

William, on the other hand, claims that he received harassing phone calls and text messages[13] from Weber. (DSMF ¶ 40). Weber testified that he did not recall sending text messages or e-mails on September 9, 2014. (ECF no. 37-1, Exh. D at 65:21 to 67:5). However, he did testify that he recalled some of it, "but some of it is not stuff that [he] had said." (*Id.* at 67:5 to :10).

### II.    Legal Standard

Federal Rule of Civil Procedure 56(a) provides that the court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of

---

[12]    September 9, 2014 was a Tuesday.

[13]    Longo submitted copies of the alleged text messages as Exhibit H. *See* (ECF no. 37-1, Exh. H). Weber disputes the authenticity of the Exhibit. (PSMF ¶ 40). The admissibility of the text messages is not dispositive of the current legal issues before this Court.

14

law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Hayes v. Harvey*, 874 F.3d 98, 103 (3d Cir. 2017). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence supporting the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's cases, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254. That "evidentiary burden" is discussed in the following sections.

## III. Discussion

Longo moves for summary judgment on Counts I-IV of the Complaint. (ECF no. 37-3). In Section III.A, *infra*, I consider Longo's motion as to Counts I and II, the ADA and NJLAD discriminatory discharge claims. In Section III.B, *infra*, I consider Longo's motion as to Counts III and IV, fraud and equitable fraud. In Section III.C, *infra*, I consider Count V, intentional infliction of emotional distress.[14] For the reasons discussed below, Longo's motion will be granted.

### A. Counts I and II- ADA and NJLAD Claims- Discriminatory Discharge

In Counts I and II of the Complaint, Weber alleges Longo's termination of his employment discriminated against him on the basis of a disability, in violation of both the ADA and the NJLAD. (Compl. ¶¶ 39-51). The claimed disability is the finger injury sustained in the accident with the grinder.

Claims for employment discrimination under the ADA and NJLAD are assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Alston v. Park Pleasant, Inc.*, 679 F. App'x 169, 171 (3d Cir. 2017); *Viscik v. Fowler Equip. Co.*, 173 N.J. 1, 13-14

---

[14]     Longo's submissions do not address Count V. Nevertheless, for the sake of completeness, I will consider Count V, which rests on similar facts.

(2002). Accordingly, to succeed on his claims, Weber has the initial burden of establishing a *prima facie* case. *Alston*, 679 F. App'x at 171. If he is able to make this showing, the burden of production shifts to Longo to "articulate some legitimate, non-discriminatory reason" for the termination. *McDonnell Douglas*, 411 U.S. at 802. If Longo meets this burden, the burden shifts back to Weber to show that Longo's stated reason was pretextual. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644-45 (3d Cir. 2015).

I will first address Weber's ADA claim, and will then address his NJLAD claim.

### 1. ADA

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* at § 12111(8).

To establish a *prima facie* case of employment discrimination under the ADA, a plaintiff must establish that (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010).

Here, Longo's motion for summary judgment focuses on two elements: (1) whether Weber is an individual with a disability under the ADA, and (2) whether Longo's decision to terminate Weber was based on Weber's disability.

### i.   Disability

The ADA's definition of disability "shall be construed in favor of broad coverage of individuals."[15] 42 U.S.C. § 12102(4)(A). *See also* 29 C.F.R. § 1630.2(j)(1)(i). Under the ADA, an individual qualifies as "disabled" if he or she has "(A) a physical or mental impairment[16] that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).

Here, Weber alleges that he was disabled for purposes of the ADA under § 12102(1)(A) ("actual disability"), and in the alternative, under § 12102(1)(C) ("regarded as disabled"). Specifically, he contends that he was disabled under the "actual disability" prong because the injury to his hand substantially limited his "ability to work in his chosen field." (Compl. ¶ 41). Alternatively, he contends that he was disabled under the "regarded as disabled" prong because "[Longo] regarded him as having such an impairment." (*Id.*)

---

[15]   In 2008, the ADA was amended by the ADAAA, effective January 1, 2009. *See* Pub. L. No. 110-325, 122 Stat. 3553 (codified at 42 U.S.C. § 12101 *et seq.*). The ADAAA "was enacted to clarify that the definition of 'disability' should be construed 'in favor of broad coverage of individuals ... to the maximum extent permitted.'" *Matthews v. Pennsylvania Dep't of Corr.*, 613 F. App'x 163, 167 (3d Cir. 2015)(quoting 42 U.S.C. § 12102(4)(A)). *See also* 29 C.F.R. § 1630.1(c)(4).

[16]   Longo mistakenly relies on 42 U.S.C. § 12102(3) for the definition of "impairment." (Def. Br. 10 to 11). That section provides a definition of "transitory impairment", which only applies to the "regarded as disabled" prong in § 12102(1)(C). *See* 42 U.S.C. § 12102(3).

EEOC Regulations, not the ADA, provide the definition of "physical or mental impairment." It is defined, in relevant part, as: "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine [.]" 29 C.F.R. § 1630.2(h)(1).

### a. "Actual disability" prong

The claimed disability consists of the injury to Weber's finger as a result of using the grinder. Under the "actual disability" prong, an individual must establish "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(1)(A). Whether an individual is substantially limited in performing a major life activity is a question of fact. *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 763 (3d Cir. 2004).

To satisfy the "actual disability" prong, the disability must "substantially limit[ ] the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). "Major life activities" include, among other activities, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Although "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting," "not every impairment will constitute a disability within the meaning of [the ADA]." 29 C.F.R. § 1630.2(j)(1)(ii).

In determining whether a "substantial limitation" exists, courts should consider "as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity." *Id.* at § 1630.2(j)(4)(i).

> Consideration of facts such as condition, manner, or duration may include, among other things, consideration of the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of a major bodily function. In addition, the non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a

particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.

*Id.* at § 1630.2(j)(4)(ii).

The claimed limitation here is impairment of Weber's performance of job duties in his chosen profession. The United States Supreme Court in *Sutton v. United Air Lines, Inc.* considered the meaning of "substantially limits" in the context of the major life activity of working. 527 U.S. 471, 491–92 (1999). Relying on EEOC Regulations in existence at the time, it stated: "the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Id.* at 491. *See Keyes v. Catholic Charities of the Archdiocese of Philadelphia*, 415 F. App'x 405, 410 (3d Cir. 2011)(quoting *Sutton*, 527 U.S. at 492). However, nine years after *Sutton*, in 2008, Congress superseded certain aspects of *Sutton* through its passage of the ADAAA,[17] stating that "the holdings of the Supreme Court in *Sutton*. . . and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect."[18] 122 Stat. 3553.

The EEOC Regulations discussing the major life activity of working, and relied upon by the *Sutton* Court, are pre-ADAAA and were subsequently

---

[17]     Here, Weber's termination occurred after the ADAAA's January 1, 2009 effective date. I will therefore apply post-ADAAA standards.

[18]     The ADAAA also superseded certain aspects of the Supreme Court's decision in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams,* 534 U.S. 184 (2002).

Moreover, the ADAAA also referred to *Sutton* in two of its express purpose provisions. Among other purposes, the ADAAA provides that its purpose is to "reject the requirement enunciated by the Supreme Court in *Sutton*. . . and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures", and "reject the Supreme Court's reasoning in *Sutton*. . . with regard to coverage under the ["regarded as"] prong of the definition of disability and to reinstate the reasoning of the Supreme Court in *School Board of Nassau County v. Arline,* 480 U.S. 273 (1987) which set forth a broad view of the ["regarded as"] prong of the definition of handicap under the Rehabilitation Act of 1973[.]"122 Stat. 3553.

removed from the text of the Regulations, effective May 24, 2011.[19] However, the "broad class of jobs" restriction remains in place notwithstanding the enactment of the ADAAA and the modified EEOC Regulations. In its Guidance, the EEOC affirms that part of the doctrine:

> In the rare cases where an individual has a need to demonstrate that an impairment substantially limits him or her in working, the individual can do so by showing that the impairment substantially limits his or her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities. . .

"Substantially Limited in Working," Appendix to Part 1630- Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. Pt. 1630, App. (2016). Therefore, Weber must demonstrate that he had a physical impairment that substantially limited him in performing a class of jobs or broad range of jobs in various classes as compared to most people with comparable training, skills, and abilities.

Thus Longo perhaps shoulders a heavier burden than necessary in attempting to demonstrate that Weber was not impaired from performing his own job, let alone a broad range of jobs in various classes, as compared to most similarly situated people. Longo argues that Weber was not disabled because he voluntarily returned to work the day after receiving stitches on his finger, and insisted on working on the same assignment he was working on before he got injured. (Def. Br. 13 to 14). They emphasize that Weber did not "say he could not work, perform a function or complain about his finger." (Id. at 13). They also rely on a May 19, 2015 medical examination of Weber conducted

---

[19]     See "Substantially Limited in Working," Appendix to Part 1630- Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. Pt. 1630, App. (2011)[hereinafter "Interpretive Guidance"](stating "[t]he [EEOC] Commission has removed from the text of the regulations a discussion of the major life activity of working.")

by Dr. Wayne J. Kerness, an orthopedic surgeon.[20] (Def. Br. 9 to 15)(citing ECF no. 37-1, Exh. K). Dr. Kerness concluded that Weber had "0% permanent partial disability" of his left index finger. (*Id.*) That finding, however, is dated from almost nine months after Weber's injury, and its relevance is therefore limited.

Weber maintains that there is a disputed issue of material fact as to whether he was "disabled" because according to him, he suffered a 35% permanent disability to his finger. (Pl. Opp. at 3)(citing ECF no. 38-5, Exh. C ¶¶ 3, 4). Weber supports this claim by citing to paragraphs 3 and 4 of his answers to interrogatories. (*Id.*) Paragraph 3 states, in part: "I suffered a 35% permanent disability to my finger." (ECF no. 38-5, Exh. C ¶ 3). Paragraph 4 states, in part: "[a]t Worker's Compensation court. . . it was determined to be a 35% permanent disability." (*Id.* at ¶ 4). This, however, was not quite an adjudication of disability. On June 23, 2015, Judge Jean Bogle of the New Jersey Workers' Compensation Division approved a settlement between Weber and the Company (ECF no. 37-1, Exh. M). An Order Approving Settlement was filed, indicating that Weber was awarded $3,937.50. (*Id.*) The following statement is handwritten in the Order under a section titled "Permanent Disability, % of": "35%, of left. . . finger for residuals of laceration . . . stitches with partial injury of ulnar digital nerve of DIP crease." (*Id.*)

Weber is not estopped from seeking ADA relief merely because he received worker's compensation benefits. By the same token, however, "obtaining worker's compensation benefits certainly does not mandate a finding

---

[20]     Although not mentioned in his brief, Weber also provided two exhibits which relate to Weber's medical condition after he was terminated. Exhibit J is a September 29, 2014 letter from Dr. Jeffrey K. Miller, an orthopedic surgeon, to Dave Becker from Liberty Mutual, Longo's worker's compensation insurance carrier. (ECF no. 37-1, Exh. J). In the letter, Dr. Miller states that he saw Weber in consultation on that date and concluded that Weber could resume use of the left hand and was capable of working without restrictions. (*Id.*) Exhibit O is a March 23, 2015 report from Dr. Miller which states that Weber "has reached the maximum benefits of medical treatment" and is capable of working with his left hand without restrictions.

of disability under the ADA." *Marinelli v. City of Erie, Pa.*, 216 F.3d 354, 366 n.8 (3d Cir. 2000)(citing *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 807 (1999)).

I do not find these disputes to be material. Here, there were no indications, either before or after Weber had his stitches removed, that a 35% loss of function in Weber's left index finger (he is right-handed) rose to the level of a disability. *See* (ECF no. 37-1, Exh. K). After receiving stitches, Weber returned to work the next day at his own insistence. He willingly resumed the same project that he was working on when he was injured. (ECF no. 37-1, Exh. C at 28:8 to :11). He continued to work for almost two weeks before the stitches were removed. During that time, Weber "claim[ed] there was no problem, he could drive the truck, he could do the different tasks." (ECF no. 37-1, Exh. C at 31:3 to :5). Donald further testified that Weber "was insistent" and "would drive the trucks home from the job" on more than one occasion. (*Id.* at 31:5 to :8).

Donald testified that, on September 5, 2014, sixteen days after Weber's injury, he returned from vacation and "found out [Weber] still did not have the stitches removed, he had no gloves on, he was working with his finger the way it is exposed, he did not have a bandage or anything on it." (*Id.* at 31:16 to :22). That morning, Weber had his stitches removed, after which he returned to work.[21] (DSMF ¶ 30). Later that afternoon, he was terminated. (*Id.* at ¶ 31).[22]

---

[21]    There is a dispute of fact as to whether Weber went to get his stitches removed because Donald urged him to, or because the clinic had informed Weber that it was the appropriate time to get the stitches removed. According to Donald, he was the one who told Weber that he had to go get the stitches removed. (ECF no. 37-1, Exh. C at 31:20 to :22). Weber, on the other hand, testified that he knew he had to return to get the stitches removed because he was given a verbal estimate by the clinic as to when to return to get them removed, but he never saw the paperwork. (ECF no. 38-3, Exh. A at 74:16 to :18). He stated that he "went back when [the stitches] were ready to come out." (*Id.* at 74:18 to :19). When asked if Donald insisted that Weber go get the stitches removed, Weber testified: "[Donald] never insisted. . . I'm not sure how it went down. All I know is I had to get my stitches taken out. I don't recall how I got there. I don't recall how it came about, who said what." (*Id.* at 75:15 to :22). I do not find this dispute particularly material to the issues.

[22]    Temporal proximity, if particularly suggestive in the context of all the facts, may support an inference of discrimination. *See LeBoon v. Lancaster Jewish Cmty. Ctr.*

Weber now says that he suffered "permanent loss of feeling, in and ability to grip with, his hand." This, he claims, substantially limits him in performing the job duties of his chosen profession. (Def. Br. 4). Inability to perform the duties of one particular job does not equate to a disability under the ADA. And in any event, Weber himself testified that he continued working after his injury because he could do welding with his right hand "and not have to use [his] left hand." (ECF no. 38-3, Exh. A at 75:25 to 76:2). To the extent his job performance may have been slow, Weber himself blames external circumstances, not the condition of his hand. If Longo fired him for circumstances beyond his control, it may have acted arbitrarily, but not discriminatorily.

There is not sufficient evidence to raise a prima facie case that Weber possessed a physical impairment that substantially limited his ability to work in September 2014. Accordingly, Longo's motion for summary judgment on Weber's ADA claim under the "actual disability" prong will be granted.

### b. "Regarded as disabled" prong

Under the "regarded as disabled" prong of the ADA's disability definition, the plaintiff must establish that "he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."[23] 42 U.S.C. § 12102(3)(A). *See also* 29 C.F.R. § 1630.2(l)(1).

However, the impairment must not be transitory and minor. *Id.* at § 12102(3)(B). A "transitory impairment" is "an impairment with an actual or expected duration of 6 months or less." *Id.* In determining whether an

Ass'n, 503 F.3d 217, 232 (3d Cir. 2007). Here, however, the termination took place after the stitches were removed, indicating that the healing, if not complete, was well underway. Particularly in the context of the other justifications for termination, there is no legitimate inference of discrimination based on timing alone.

[23]    As previously stated in footnote 15 of this opinion, the ADAAA expressly rejected *Sutton*'s interpretation of "regarded as having such an impairment." Congress thereafter changed the language of the statute.

impairment is "transitory and minor," "[t]he relevant inquiry is whether the actual or perceived impairment on which the employer's action was based is objectively 'transitory and minor,' not whether the employer claims it subjectively believed the impairment was transitory and minor." Interpretive Guidance, at Section 1630.2(l).

Longo argues that Weber's lacerated finger can "at best" be considered a transitory impairment. (Def. Br. at 11). Weber responds that Longo has not proven that his impairment was transitory and minor. (Pl. Opp. at 5). According to Weber, Longo has provided no evidence "that the injury was expected to or did last only 6 months." (*Id.* at 6). Weber further contends that William Longo's alleged unhappiness about him returning to work rather than taking time off demonstrates that he was perceived as disabled. (*Id.*)

I find that Weber has failed to present sufficient evidence from which a jury could reasonably conclude that he was "regarded as disabled" within the meaning of the ADA. The evidence shows only that Don and William Longo regarded Weber as having a temporarily-impaired left index finger. Longo regarded Weber as having a stitched finger which required him to rest for a few days or do "light duty," an accommodation which Weber himself largely rejected.

Longo may have believed that Weber would temporarily be unable to complete the full range of his duties; however, Weber presented no evidence to dispute that Longo saw him as having a temporary, non-severe injury without permanent or long-term impact. There is no evidence that Weber's stitches on the index finger of his non-dominant hand resulted in Longo's perceiving Weber as suffering from a severe ongoing impairment. Accordingly, Longo's motion for summary judgment on Weber's ADA claim under the "regarded as disabled" prong will be granted.[24]

---

[24]    Given my conclusion that Weber fails to establish a *prima facie* ADA discrimination case, I will not, reach the remaining elements, and the next steps of the *McDonnell Douglas* framework. In particular, I do not here reach any issues of fact

## 2. NJLAD

"The NJLAD prohibits unlawful discrimination against an individual with respect to terms and conditions of employment because of various traits and characteristics, including, but not limited to, race, religion, age, sex and disability." *Davis v. Supervalu, Inc.,* CIV. 13–414 JBS/JS, 2013 WL 1704295, at *4 (D.N.J. Apr. 19, 2013) (citing N.J.S.A. § 10:5–12(a)). In the context of disability, it prohibits "any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment." N.J.S.A. § 10:5–4.1.

"[T]he statutory definition a disability is very broad in scope." *Fitzgerald v. Shore Mem'l Hosp.*, 92 F. Supp. 3d 214, 236 (D.N.J. 2015)(citing *Clowes v. Terminix Intern., Inc.,* 109 N.J. 575, 538 A.2d 794, 802 (1988)). Unlike the definition of disability under the "actually disabled" prong of the ADA definition of disability, NJLAD does not require that a disability restrict any major life activities to any degree. *See Enriquez v. West Jersey Health Systems*, 342 N.J. Super. 501, 519, 777 A.2d 365 (App. Div. 2001). A "disability" is defined thus:

> physical or sensory disability, infirmity, malformation, or disfigurement which is caused by bodily injury, birth defect, or illness including epilepsy and other seizure disorders, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impairment , deafness or hearing impairment , muteness or speech impairment, or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or any mental, psychological, or developmental disability, including autism spectrum disorders, resulting from anatomical, psychological, physiological, or neurological conditions which prevents the typical exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. . .

---

regarding Longo's explanation of the employment action, and possible pretext arguments by Weber.

N.J.S.A. § 10:5-5(q).

Under the NJLAD, to establish a *prima facie* case of disability discrimination for discriminatory discharge, a plaintiff must demonstrate that: "(1) [he] is the member of a protected class, specifically that [he] has or is perceived to have a disability as defined by the NJLAD; (2) [he] was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; (3) [he] experienced an adverse employment action; and (4) the employer sought someone else to perform the same work, or did fill the position with a similarly-qualified person." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 848 (3d Cir. 2016)(footnote omitted)(citing *Victor v. State*, 203 N.J. 383, 409 (2010)). "Satisfaction of all four elements of a *prima facie* case creates a presumption of discrimination." *Id.* (citing *Andersen v. Exxon Co., U.S.A.*, 89 N.J. 483, 492-93 (1982)).Once those four *prima facie* elements are satisfied, disability discrimination claims under the NJLAD proceed through the remainder of the three-part *McDonnell Douglas* framework. *Id.* (citing *Viscik v. Fowler Equip. Co.*, 173 N.J. 1, 13 (2002); *Andersen*, 89 N.J. at 493).

In the particular context of a disability discrimination claim, the New Jersey Supreme Court has emphasized that "[d]isability discrimination claims are different from other kinds of discrimination claims, for several reasons":

> That is, for claims of disability discrimination, the first element of the prima facie case, that plaintiff is in a protected class, requires plaintiff to demonstrate that he or she qualifies as an individual with a disability, or who is perceived as having a disability, as that has been defined by statute. The second element requires plaintiff to demonstrate that he or she is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without a reasonable accommodation.

*Id.* at 410 (footnote omitted).

My role here is not to evaluate the credibility of Weber's evidence but only to determine whether it genuinely places relevant facts in issue. *Anderson*, 477 U.S. at 248-49. Viewing the record and drawing all reasonable inferences

27

in the light most favorable to Weber, I find there is a genuine issue of material fact as to whether Weber's condition falls within the broad definition of disability within the meaning of NJLAD. I therefore assume that Weber satisfies the "disability" element, and could establish the remaining elements of a *prima facie* case of disability discrimination.

I move to the second step, *i.e.,* whether Longo has met their burden of providing a legitimate, non-discriminatory reason for terminating Weber. The proffered reasons are that Weber was fired for his reluctance to follow instructions and his poor work performance. As outlined above, these are legitimate, nondiscriminatory reasons for firing, and they have record support.

I therefore move to the third step. To avoid summary judgment, Weber "must either (1) offer evidence that casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonable conclude that each reason was a fabrication, or (2) present evidence sufficient to support an inference that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Shahin v. Delaware*, 563 F. App'x. 196, 199 (3d Cir. 2014). Notably, "at the pretext stage, it is not a court's role to rule on the strength of cause for discharge. The question is not whether the employer made the best, or even sound, business decision; it is whether the real reason is discrimination." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 647 (3d. Cir. 2015).

In his attempt to satisfy that burden, Weber maintains that he had no negative performance reviews. The alleged comment by William that he was not happy about Weber's injury, in Weber's view, raises a further substantial question as to whether the real reason for his discharge was his injury. (Pl. Opp. 7, 9). Weber also notes that there were no written reports from his coworkers expressing dissatisfaction or discomfort with him *before* his termination, but only after. (*Id.* at 7). Finally, Weber asserts that William's alleged statement during the September 9th meeting about lack of materials

weakens Longo's claims that they were dissatisfied with his performance. (*Id.* at 7 to 8).

This evidence fails to cast sufficient doubt upon Longo's reasons for terminating Weber. No reasonable trier of fact could conclude that the articulated reasons for Weber's termination were "so clearly wrong as to imply discriminatory animus." *Ade v. KidsPeace Corp.*, 401 F. App'x. 697, 704 (3d Cir. 2010). Moreover, Weber has also been unable to "point to evidence with sufficient probative force that a fact finder could conclude by a preponderance of the evidence that [the plaintiff's disability] was a motivating or determinative factor in the employment decision." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998). A statement that the employer is not "happy" about a worker being injured, for example, does not suggest discrimination.

Accordingly, Longo's motion for summary judgment on Count II, Weber's NJLAD claim, is granted.

## B. Counts III and IV- Fraud and Equitable Fraud

In Count III of the Complaint, Weber alleges that Longo engaged in fraud by advising him and promising him that they would reinstate him to his position. (Compl. ¶¶ 52-61). In particular, he maintains that on September 9, 2014, Longo advised him that he was reinstated and should report back to work. (*Id.* at ¶ 53). According to Weber, Longo thereafter "perpetuated the falsity" by lulling him in two ways: 1) repeatedly pushing back the date for him to report to work, and 2) assuring him that he still had his job. (*Id.* at ¶ 54). Weber asserts that the representations made by Longo were material, false and known to be false at the time of their utterance by Donald and William. (*Id.* at ¶¶ 56-57). He asserts that he relied upon those representations to his detriment by believing he had a job and therefore, failing to begin to search for alternative employment. (*Id.* at ¶¶ 59-60).

To establish fraud under New Jersey law, a plaintiff must prove[25] that the defendants made (1) a material misrepresentation of present or past fact (2) with knowledge of its falsity (3) with the intention that the other party rely thereon (4) which resulted in reasonable reliance by plaintiff and (5) which resulted in damages to the plaintiff. *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 388 (3d Cir. 2016) (citing *Liberty Mut. Ins. Co. v. Land*, 186 N.J. 163, 175 (2006)).

The New Jersey Appellate Division has explained that:

> [t]he representation may consist of a present intention to act or not act in the future. This intention may be derived from circumstantial evidence such as: the recklessness or implausibility of the statement in light of later events; showing that the promisor's intentions were dependent upon contingencies known only to the promisor; or simply from evidence indicating that the promisor would not or could not fulfill the promise. . . But, mere proof of nonperformance does not prove a lack of intent to perform.

*Stochastic Decisions, Inc. v. DiDomenico*, 236 N.J. Super. 388, 396, 565 A.2d 1133, 1137 (App. Div. 1989)(internal citations omitted). *See Fabbro v. DRX*

---

[25]    The standard of proof which governs an action for legal fraud in New Jersey is clear and convincing evidence, not a preponderance of the evidence. The clear and convincing evidence standard "demands 'evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the precise facts in issue.'" *Id.* (quoting *N.J. Div. of Youth & Family Servs. v. I.S.*, 202 N.J. 145, 168 (2010)). On this record, the distinction would make no difference to the resolution of the summary judgment motion.

In one 1993 case, the Third Circuit held that a plaintiff asserting legal fraud must prove the elements by a preponderance of the evidence. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1182–83 (3d Cir. 1993)(citing *Batka v. Liberty Mut. Fire Ins. Co.*, 704 F.2d 684, 688 (3d Cir.1983)). However, as recognized by former United States District Judge Stephen Orlofsky in *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 214 F. Supp. 2d 453, 457 (D.N.J. 2002), "[t]he weight of authority supports the conclusion that claims of legal fraud in New Jersey must be proven by clear and convincing evidence."). I agree with former District Judge Orlofsky's conclusion- the applicable burden of proof is the clear and convincing standard. *See also In re Resorts Int'l, Inc.*, 181 F.3d 505, 509 (3d Cir. 1999)(recognizing that the standard of proof for claims of legal fraud is clear and convincing evidence); *Angrisani v. Capital Access Network, Inc.*, 175 F. App'x 554, 556 (3d Cir.2006) (stating that the elements of common law fraud must be proven by clear and convincing evidence).

*Urgent Care, LLC*, 616 F. App'x 485, 488 (3d Cir. 2015)(quoting *Notch View Assocs. v. Smith*, 260 N.J.Super. 190, 615 A.2d 676, 682 (Ch. Div. 1992)) (recognizing that " '[u]nder New Jersey law, statements as to future events, expectations, or intended acts, do not constitute misrepresentations despite their falsity, if the statements were not made with the intent to deceive,' and '[m]ere nonperformance is insufficient to show that the promisor had no intention of performing.' ").

Longo's summary judgment arguments do not focus on the elements of fraud. Rather, they emphasize that Weber was an at-will employee who was given severance pay for two weeks. (Def. Br. 21 to 23). The implication seems to be that Weber was not deprived of anything to which he was entitled. Longo's payment of severance, though relevant, does not in itself wholly erase the possibility of fraud. Still, Longo's arguments do implicate the elements of reliance and damages. Even assuming that Longo strung Weber along briefly before actually firing him, they say, "[t]here was no hardship that [Weber] endured because of the promise to hire him back on a trial basis" and "[t]here is no evidence in the record that he passed up or declined other employment as a result of any act or omission of [Longo]." (*Id.* at 23).[26] I agree. Even assuming that Longo was stringing Weber along, the period of time involved encompassed several days in September, during which he remained on the payroll, and there is no showing whatever that Weber sacrificed any employment or other opportunity during that period. I will therefore grant Longo's motion for summary judgment on Count III.

In Count IV of the Complaint, Weber alleges that Longo engaged in equitable fraud by telling him that he would receive higher pay and better benefits, and would "have a bright future with them." (*Id.* at ¶ 64). Weber maintains that Longo's representations were false because "they knew or should have known that they would terminate [Weber's] employment if he were

---

[26]     Indeed, there is no evidence that William Longo's alleged statements regarding possible return dates were false when made, other than the fact of subsequent non-performance, which, standing alone, would not suffice.

to, e.g., complain about unsafe work environ[ments] or suffer workplace injury." (*Id.* at ¶ 66). He further maintains that he reasonably relied upon Longo's material representations to his detriment and that the representations were made with the intention that he rely on them, whether or not Longo knew that they were false at the time of their utterance. (*Id.* at ¶¶ 68-69). The proffered evidence, however, does not back up these conclusory allegations.

To establish equitable fraud under New Jersey law, a plaintiff need not establish scienter; "'knowledge of the falsity and an intention to obtain an undue advantage therefrom,' is not required." *Phoenix*, 628 F. App'x at 827 (quoting *Jewish Cntr. of Sussex Cnty. v. Whale*, 86 N.J. 619, 432 A.2d 521, 524 (1981)). Plaintiff must, however, allege and prove the other elements of legal fraud. *Wirth v. Telcordia Techs., Inc.*, 247 F. App'x 366, 369 (3d Cir. 2007).

Here, the elements of reliance and damages, as in the case of legal fraud, are missing from the evidence. In addition, Count IV improperly seeks monetary damages. (Compl. ¶ 71). A claim in equitable fraud allows only equitable relief, not money damages. *Foont-Freedenfeld Corp. v. Electro-Protective Corp.*, 126 N.J. Super. 254, 257, 314 A.2d 69 (App. Div. 1973), *aff'd*, 64 N.J. 197 (1974) (*per curiam*) (stating that "in an action in which plaintiff relies upon equitable fraud, the only relief that may be sought is equitable relief, such as rescission or reformation of an agreement, and not monetary damages only."). *See also Jewish Cntr.*, 86 N.J. at 624–25. Accordingly, I grant summary judgment and dismiss Count IV as well.

## C. Count V- Intentional Infliction of Emotional Distress

The parties do not specifically address Count V, intentional infliction of emotional distress. Count V alleges that Weber suffered depression, anxiety, and sleep loss as a result of 1) his unlawful termination, 2) Longo repeatedly telling him that he still had his job despite contacting an attorney to represent them and terminate Longo, and 3) Longo's decision to contact the police about his alleged harassment. (Compl. at ¶¶ 72-92). Weber maintains that Longo's

actions "were outrageous and extreme, and taken with the aim or assurance of causing [him] severe emotional distress." (*Id.* at ¶ 89).

To establish a claim for intentional infliction of emotional distress, a plaintiff must establish: (1) that Defendants acted intentionally or recklessly, both in doing the act and in producing emotional distress; (2) that Defendants' conduct was so outrageous in character and extreme in degree as to go beyond all bounds of decency; (3) that Defendants' actions were the proximate cause of the emotional distress; and (4) that the emotional distress suffered was so severe that no reasonable person could be expected to endure it. *Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 366 (1988). "[U]nder New Jersey law, intentional infliction of emotional distress comprehends conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Subbe–Hirt v. Baccigalupi,* 94 F.3d 111, 114 (3d Cir. 1996) (quoting Restatement (Second) of Torts § 46 comment d).

The alleged conduct does not rise to the extreme level required for proving a claim of intentional infliction of emotional distress. "[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395 (3d Cir.1988), *cert. denied,* 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990). The United States Court of Appeals for the Third Circuit has further recognized that "'while loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event' and cannot provide a basis for recovery for infliction of emotional distress." *Id.* at 395 (quoting *Brieck v. Harbison–Walker Refractories,* 624 F.Supp. 363, 367 (W.D. Pa.1985), *affd. in relevant part,* 822 F.2d 52 (3d Cir.1987)). *See also Griffin v. Tops Appliance City, Inc.,* 337 N.J. Super. 15, 766 A.2d 292, 297 (2001); *accord Catullo v. Liberty Mut. Group, Inc.,* 2012 WL 762163 at *9 (D.N.J. Mar. 6, 2012); *Jewett v. IDT Corp.,* 2008 WL 508486 at *4 (D.N.J. Feb. 20,

2008). Any waffling about whether to fire Weber was short-lived; Weber remained on the payroll while it occurred; and there is no showing that it caused him more suffering than immediate termination would have. The harassment claim, for all that appears here, never went anywhere, and it was based on actual events (*i.e.,* the hard hat incident in the workplace). Nothing about these matters exceeds the bounds of civilized conduct.

Moreover, Weber's intentional infliction of emotional distress claim rests, in part, on allegations of discrimination that have now been rejected. *See* Section III.A, *supra*. A plaintiff may not pursue such a claim "to circumvent the required elements of or defenses applicable to another cause of action that directly governs a particular form of conduct." *Griffin*, 337 N.J. Super. at 24, 766 A.2d at 297.

I therefore grant summary judgment and dismiss Count V.

## IV.     Conclusion

For the foregoing reasons, Longo's motion for summary judgment (ECF no. 37) is granted as to the entire complaint.

An Order will be entered in accordance with this Opinion.

Dated:  March 2, 2018

**Hon. Kevin McNulty**
**United States District Judge**